# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

ALAN PERKOSKI,    :
          :
    Plaintiff   :  No. 3:14-CV-1863
          :
   vs.     :  (Judge Nealon)
          :
CAROLYN W. COLVIN, Acting :
Commissioner of Social Security, :
          :
    Defendant  :

## <u>MEMORANDUM</u>

On September 25, 2014, Plaintiff, Alan Perkoski, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying his application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §

1461, <u>et</u> <u>seq</u>.  (Doc. 1).  The parties have fully briefed the appeal.  For the reasons

set forth below, the decision of the Commissioner denying Plaintiff's application

for DIB will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] his application for DIB on February 8, 2011, alleging disability beginning on December 1, 2008 due to back injuries and depression. (Tr. 10, 146).[3] The claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on July 22, 2011. (Tr. 10). On August 15, 2011, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 10). A hearing was held on July 11, 2012, before administrative law judge Michelle Wolfe ("ALJ"), at which Plaintiff and an impartial vocational expert, Patricia L. Chilleri ("VE"), testified. (Tr. 10). On December 14, 2012, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail _infra_, Plaintiff could perform sedentary work with limitations. (Tr. 15).

On January 17, 2013, Plaintiff filed a request for review with the Appeals

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 1, 2014. (Doc. 10).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Council. (Tr. 6). On July 29, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on September 25, 2014. (Doc. 1). On December 1, 2014, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of his complaint on February 13, 2015. (Doc. 13). Defendant filed a brief in opposition on March 25, 2015. (Doc. 18). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on February 24, 1965, and at all times relevant to this matter was considered a "younger individual."[5] (Tr. 142). Plaintiff completed one (1) year of college, and can communicate in English. (Tr. 145-146). His employment records indicate that he previously worked as a sporting goods wholesaler from April 1986 to July 2003 and as a shipper/ truck drive from February 2004 to December 2008. (Tr. 152). The records of the SSA reveal that Plaintiff had earnings in the years 1983 through 2009. (118). His

_____

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

annual earnings range from a low of eighty-eight dollars ($88.00) in 2009 to a

high of forty-four thousand six hundred eighty-eight dollars and eighty-eight cents

($44,688.88) in 2008. (Tr. 118). His total earnings during those twenty-six (26)

years were five hundred ninety-nine thousand eight hundred thirty-one dollars and

forty-eight cents ($599,831.48). (Tr. 118).

In a document entitled "Function Report - Adult" filed with the SSA on

May 2, 2011, Plaintiff indicated that he lived in a house with his family. (Tr.

160). From the time he woke up to the time he went to bed, Plaintiff would take

short walks and drives, watch television, and do light housework depending on his

level of pain. (Tr. 160). He did not take care of any people or pets. (Tr. 161).

His impairments affected his sleep, as he would sleep for two (2) to three (3) hours

at a time, and then would be awake for five (5) to six (6) hours. (Tr. 161). He had

no problem with personal care, was able to drive a car, was able to shop for

groceries once or twice a week, and engaged in light house cleaning, including

dusting and sweeping and mopping the floors, once or twice a week. (Tr. 162-

163). He was able to walk a quarter to a half of a mile, and would have to rest for

twenty (20) to thirty (30) minutes before he could resume walking. (Tr. 165).

When asked to check items which his "illnesses, injuries, or conditions affect,"

Plaintiff did <u>not</u> check reaching, talking, hearing, seeing, completing tasks,

understanding, or using hands.  (Tr. 165).

Regarding his concentration and memory, Plaintiff did not need special reminders to take care of his personal needs or to take his medicine.  (Tr. 162).  He could count change, handle a savings account, and use a checkbook.  (Tr. 163). However, he noted that since his impairments began, he was "not as careful as [he] should be and ma[d]e mistakes."  (Tr. 164).  He could pay attention for one (1) hour, could not finish what she started, had to read written instructions "over and over" as to avoid missing anything, did not follow spoken instruction well due to forgetting what he was told, and did not handle stress or changes in routine well. (Tr. 165-166).

Socially, Plaintiff went outside once or twice a day, but did not go anywhere on a regular basis.  (Tr. 163-164).  He used to camp, fish, hike, and play sports, but had not engaged in any of these activities since his injury to his back occurred. (Tr. 164).  He had limited visits and phone calls with others, and would go to family functions for a short time.  (Tr. 164).  He had problems getting along with family, friends, neighbors, and others because the "pain [kept him] from being sociable."  (Tr. 165).  He stated that before his impairments began, he used to be "outgoing and sociable, but [was now] mostly 'miserable,'" according to his wife. (Tr. 165).

Plaintiff also filled out a Supplemental Function Questionnaire concerning his pain. (Tr. 168). He stated his pain began on December 1, 2008 due to two (2) herniated discs in his lower back. (Tr. 168). He described his pain as "mostly numbness, tingling, with shooting, stabbing pain if [he] move[d] wrong or tr[ied] to do most physical activities." (Tr. 168). He indicated that the nature of his pain had not changed since it began, was almost constant, was present in his lower back, spread down into his left leg and sometimes his right leg, and was increased by physical activities and extreme cold. (Tr. 168). He stated that if he slept for more than a couple of hours, his back felt like it would "break in two pieces if [he] tr[ied] to move or stand up." (Tr. 168). He indicated that his eating habits changed since the onset of pain, and that he gained about thirty (30) pounds. (Tr. 169). He was taking Vicodin and Extra Strength Tylenol for the pain as needed since December 1, 2008. (Tr. 169). These medications relieved the pain "long enough for [Plaintiff] to get 3 hours [of] sleep." (Tr. 169). The side effects of these medications were hallucinations and making Plaintiff feel "like a zombie." (Tr. 169). Plaintiff noted that he had attended physical therapy for his pain. (Tr. 169).

At his hearing, Plaintiff testified that he was disabled due to his back impairments and depression. (Tr. 40). Initially, Plaintiff's attorney presents the

background of the claim to the ALJ, which is that Plaintiff suffered two (2) herniated discs in a work-related injury in December of 2008, for which he underwent an anterior and posterior fusion in April of 2009 from which he never recovered and that left him in pain. (Tr. 40). As described by Plaintiff's attorney, this pain left Plaintiff in constant pain that increased greatly with any simple activity, caused an inability to sit or stand for any reasonable length of time, caused difficulty sleeping, and left him depressed. (Tr. 40-41). Plaintiff testified that he could not return to work because of his pain level, and the fact that "moving a lot, walking or sitting for too long or standing for too long, it just hurt[] too much [and his] [left] leg [would go] numb on [him] [and] give[] out." (Tr. 44). Plaintiff stated that he attended physical therapy after his surgery in April 2009, and was taking Norco for pain every six (6) to eight (8) hours. (Tr. 49). This medication would take his pain down to a four (4) or five (5) out of ten (10), and when it wore off, his pain increased to an eight (8) or nine (9) out of ten (10). (Tr. 54). The pain medication made him very sleepy and foggy. (Tr. 50). To relieve his pain, he would put his left leg up or lay down, which occurred usually for four (4) hours during an eight (8) hour stretch. (Tr. 56).

In terms of activities during the day, Plaintiff stated he did not do much, aside from sitting, watching television, laying on the couch, and getting up and

walking "a little bit here and there." (Tr. 51). Plaintiff indicated that his pain and impairment affected his personal grooming habits because "[j]ust stepping over that lip on the shower into a slipper tub like that, it scare[d] [him]." (Tr. 60). He went up and down the stairs about once a day, and recently moved in with his mother because she lived in a one (1) floor house. (Tr. 61). He testified that he drove very rarely due to his pain and the side effects from his pain medication. (Tr. 51). He was able to wash the dishes and would go for the ride to the store. (Tr. 51). As far as his sleep was concerned, he got about four (4) hours of sleep on a good night, but normally he was up and down every two (2) hours and sometimes he could not fall asleep due to pain. (Tr. 52). Plaintiff described a good day as getting four (4) hours of sleep, being able to walk around a little more in the house, and being able to shower. (Tr. 61). He testified that he had about seven (7) or eight (8) good days a month. (Tr. 62). A bad day was not moving from the couch due to pain that would increase with any extra movement and due to the feeling like his spine was "just going to come apart." (Tr. 62). He indicated that he had about fifteen (15) really bad days a month. (Tr. 62).

He was able to walk a block with a cane on level, solid ground before the pain would increase. (Tr. 53). He indicated it would be difficult to walk on uneven ground because he worried that his leg would give out and also because

the uneven ground increased his pain "a lot." (Tr. 59). He could stand for ten (10) to fifteen (15) minutes, and could sit for a half hour. (Tr. 53). He was unable to lift or carry anything, and bending and stopping "really hurt even with the medication." (Tr. 54). He wore his sneakers with the laces untied because bending over to tie them increased his pain. (Tr. 60).

He further testified that he would work if he could because of his terrible financial situation and the effect that not working was having on his relationship with his wife. (Tr. 55, 58). His mood and overall emotional state was not good because he was "supposed to be the man of the house and [he could not] get out there and work." (Tr. 57). Plaintiff testified that he broke down in tears over his situation a couple times a week, and that he had suicidal thoughts. (Tr. 57-58). He indicated that he no longer had a social life, whereas before his injury and subsequent impairment, he would go fishing, camping, and out with friends. (Tr. 57).

**MEDICAL RECORDS**

On January 14, 2009, Plaintiff had an appointment with Alan P. Gillick, M.D. due to injuries sustained in the work-related accident in December of 2008. (Tr. 255). Since the accident, Plaintiff had been experiencing lower back pain radiating down his leg. (Tr. 255). He was attending physical therapy and was

taking oral steroids and Motrin, but without much alleviation of his pain. (Tr. 255). His physical exam revealed that his pain was localized to the low lumbar spine, and that he had increased pain with extension, a negative straight leg raise test for his right leg, and a positive straight leg raise test for his left leg. (Tr. 255). His MRI showed degenerative disc disease ("DDD") at L4-L5 and L5-S1 with herniation on the left at these same levels. (Tr. 255). Surgical repair was discussed. (Tr. 255).

On February 2, 2009, Plaintiff underwent a CT scan of his lumbar spine. (Tr. 232). The conclusion was that there was a moderate central disc protrusion at the L4-L5 level, and posterior vertebral body spondylosis and disc bulging at L5-S1, which caused a mild impression on the anterior thecal sac and mild scoliosis. (Tr. 232).

On April 2, 2009, Plaintiff had a preoperative appointment with Stephen Jaditz, D.O. for clearance for surgery. (Tr. 234). A physical exam revealed that Plaintiff had tenderness of the lumbar paraspinal area bilaterally and intact lower extremity reflexes. (Tr. 235).

On April 14, 2009, Plaintiff was admitted to Community Medical Center ("CMC") in Scranton, Pennsylvania to undergo: (1) an anterior discectomy and interbody fusion of the at the L4-L5 and L5-S1 level utilizing PEEK cages; and (2)

a lumbar laminectomy and decompression of the left L4-L5 disc. (Tr. 192). This surgery was being performed due to Plaintiff's diagnosis of DDD with an internal disc disruption at the L4-L5 and L5-S1 levels with left-sided herniation at the L4-L5 level. (Tr. 192). Plaintiff's hospital course was unremarkable, and he was discharged on April 19, 2009. (Tr. 192-193).

On May 18, 2009, Plaintiff had a post-surgical follow-up appointment with Dr. Gillick. (Tr. 258). It was noted that he was doing excellent, was much improved from the time he left the hospital, and had been doing extremely well in terms of pain levels. (Tr. 258). His physical exam revealed a well-healed incision, minimal tenderness, negative straight leg raise tests, normal motor and sensation in his lower extremities, and reflexes rated at +1 and symmetric. (Tr. 258). His x-rays showed "intact instrumentation and anatomic alignment," he was instructed to cautiously increase his activity level, and he was scheduled for an appointment in six (6) weeks. (Tr. 258).

On August 10, 2009, Plaintiff had an appointment with Dr. Gillick. (Tr. 259). He was struggling with pain that he felt had not improved and had not changed significantly from his preoperative status. (Tr. 259). His pain radiated into his left leg and somewhat into the medial aspect of his calf and foot. (Tr. 259). His exam revealed a positive straight leg raise test on his left leg and

decreased sensation along his medial calf. (Tr. 259). Dr. Gillick suggested a new MRI scan and scheduled a follow-up visit. (Tr. 259).

On August 14, 2009, Plaintiff underwent an MRI of his lumbar spine. (Tr. 244). The MRI revealed the following: (1) minimal disc space narrowing at L2-L3; (2) a question of a left laminotomy defect with epidural scarring, mild neural foraminal narrowing, and facet joint degenerative changes; and (3) posterior osteophytic ridging at the L5-S1 level with mild neural foraminal narrowing and facet joint degenerative changes. (Tr. 244-245). There was no evidence of disc herniation or central canal stenosis. (Tr. 245).

On September 9, 2009, Plaintiff had a follow-up appointment with Dr. Gillick. (Tr. 263). Plaintiff still had pain in his left leg in the medial aspect of his thigh, lower leg, and foot. (Tr. 263). His physical exam from his prior appointment remained unchanged, and the MRI appeared to be "completely normal." (Tr. 263). Dr. Gillick recommended that Plaintiff try Lyrica, and scheduled him for a follow-up visit. (Tr. 263).

On November 11, 2009, Plaintiff had a follow-up appointment with Dr. Gillick. (Tr. 264). Plaintiff reported that he was doing "a bit better," that his leg pain was improving, and that he was off narcotic pain medication. (Tr. 264). His physical exam revealed no significant pain with movements in flexion, extension,

or rotation, negative straight leg raise tests, normal motor and sensation of the lower extremities, and no significant midline lower lumbar tenderness. (Tr. 264). He was prescribed physical therapy, and was told to cautiously increase his activity level. (Tr. 264).

On January 25, 2010, Plaintiff had a follow-up appointment with Dr. Gillick. (Tr. 265). He was symptomatically "about the same," and his primary discomfort was in his left leg. (Tr. 265). He had attended physical therapy for about a month, but missed a month "for personal reasons." (Tr. 265). His physical exam revealed minimal tenderness and discomfort with flexion and extension movements, a positive straight leg raising text in his left leg, decreased sensation on the left, and normal motor strength. (Tr. 265). He was instructed to resume physical therapy again. (Tr. 265).

On April 5, 2010, Plaintiff had a follow-up appointment with Dr. Gillick. (Tr. 266). Plaintiff reported that he was not doing well, and that he was attending physical therapy, which increased his pain on the days he had therapy. (Tr. 266). His physical exam revealed tenderness in the peri-incisional area, pain with flexion and extension movements, negative straight leg raise tests, and normal motor and sensation of the lower extremities. (Tr. 266). His x-ray showed well-positioned interbody cages, excellent fusion bone formed within the L4-L5 cage,

intact instrumentation with reasonable evidence of lateral fusion mass, and no evidence of loosening of instrumentation within the bone. (Tr. 266). In Dr. Gillick's opinion, the etiology of the pain was unclear. (Tr. 266). Dr. Gillick suggested pool therapy and setting up a physiatry appointment to "ask for any other suggestions or treatment options or even other suggestions with therapy." (Tr. 266).

On April 16, 2010, Plaintiff had an appointment with Dean Mozeleski, M.D. (Tr. 216-217). Plaintiff rated his pain at a three (3) to eight (8) out of ten (10), and stated that it was constant and unchanging. (Tr. 216). His pain was worsened by bending forward, backward, and sideways, as well as by lying on his back or side, coughing, and sneezing. (Tr. 216). Plaintiff reported experiencing fatigue, weakness, trouble sleeping, back pain, numbness and tingling in his left leg, depression, and anxiety. (Tr. 217). He needed some assistance caring for his family and was unable to clean the house, but was able to walk, dress, bathe, eat, and drive independently. (Tr. 217). A physical exam revealed local hypertonicity in the lower lumbar spine, tenderness throughout his midline and his bilateral paraspinal area from L3-L5, an extension to fifteen (15) degrees with increased pain, minimal tenderness over his sacroiliac joints, and increased pain with left hip internal and external rotation. (Tr. 217). Plaintiff's left-sided lower limb,

including the medial thigh, calf, ankle, and foot, were hypoesthetic. (Tr. 218). Dr. Mozeleski's impression included: (1) status post lumbar spine fusion; (2) persistent low back and left leg radicular pain; and (3) minimal improvement with physical therapy thus far. (Tr. 218). The treatment plan was for Plaintiff to continue with his current therapy, and to return in three (3) weeks to discuss the possibility of either injections or the spinal cord stimulator. (Tr. 218).

On May 28, 2010, Plaintiff had a follow-up appointment with Dr. Mozeleski. (Tr. 219). He graded his pain at a four (4) out of ten (10), stated that it continued to interfere with his sleep, and indicated he could walk for fifteen (15) to twenty (20) minutes, stand for one (1) to two (2) hours, and sit for one (1) hour before needing to change positions secondary to pain. (Tr. 219). His exam revealed a positive straight leg raise test in his left leg causing low back and left leg pain, tenderness in his hip and sacroiliac region with any internal and external rotation of the left hip causing left leg pain to the medial thigh, calf, and foot, weakness in his left ankle dorsiflexor, an intact but slow plantar flexion, and a sensory-medial thigh and calf hypoesthetic to light touch. (Tr. 219-220). Plaintiff wished to pursue the spinal cord stimulator trial and Neurontin, and was scheduled for a follow-up appointment in six (6) weeks to further discuss the plan for the stimulator trial. (Tr. 220).

On June 2, 2010, Plaintiff had an MRI of his thoracic spine without contrast.  (Tr. 221).  The conclusion from this MRI was that Plaintiff had thoracic spondylosis with multiple mild disc protrusions, and a small indeterminate cystic lesion inferior to the posterior aspect of the right third rib.  (Tr. 222).

On June 7, 2010, Plaintiff had an appointment with Dr. Gillick.  (Tr. 267). He reported that he was "not better symptomatically with the pool therapy."  (Tr. 267).  It was noted that he continued to have some left leg symptoms, but primarily experienced ongoing back pain and burning.  (Tr. 267).  His physical exam revealed low lumbar tenderness, increased pain with flexion, extension, and rotation, a somewhat positive straight leg raise test on the left leg, and normal motor and sensation of the lower extremities.  (Tr. 267).  Dr. Gillick recommended that Plaintiff return to "regular therapy" as opposed to pool therapy as that was not helping.  (Tr. 267).  Additionally, a spinal cord stimulator possibility was discussed.  (Tr. 267).

On August 26, 2010, Plaintiff underwent an independent medical evaluation performed by David N. Bosacco, M.D.  (Tr. 306).  Dr. Bosacco reviewed Plaintiff's workers compensation reports and medical records, and conducted a physical exam.  (Tr. 306-308).  The physical exam revealed that Plaintiff had normal gait, appearance, and posture, intact patellar and Achilles reflexes, normal

sensation to light touch and normal motor power in the lower extremities, a positive straight leg raise test on the left, normal heel and toe standing, no lumbar spasm, and a negative hip rotation. (Tr. 308). Dr. Bosacco diagnosed Plaintiff with lumbar sprain and strain and aggravation of lumbar disc disease status post fusion surgery, and recommended that Plaintiff undergo four (4) to six (6) weeks of physical therapy. (Tr. 308). He opined that Plaintiff could not return to work without restrictions, but did not indicate what these restrictions were. (Tr. 308). He also opined that Plaintiff was capable of performing sedentary work. (Tr. 308).

On October 11, 2010, Plaintiff had a follow-up appointment with Dr. Gillick. (Tr. 268). It was noted that he was symptomatically about the same, and was still experiencing some back pain and leg symptoms. (Tr. 268). He discussed his interest in pursuing the trial spinal cord stimulator with Dr. Mozeleski. (Tr. 269). His physical exam remained the same, and his x-rays remained unchanged. (Tr. 268). Plaintiff stated that his worst symptom was that, on occasion, he felt a pop in his back and had "such pain that his leg [would] go out from under him and he [would] fall." (Tr. 268). Dr. Gillick recommended that a psychological evaluation be performed, discussed with Plaintiff the possibility of having the spinal instrumentation removed, and scheduled Plaintiff for an appointment. (Tr. 268).

On May 23, 2011, Plaintiff had a follow-up appointment with Dr. Gillick. (Tr. 269). He was still experiencing discomfort in his lower back, "but especially with this issue with his left leg which [would] give out without warning." (Tr. 269). His pain was on the medial aspect of his thigh and calf down to his big toe, which felt numb. (Tr. 269). His physical exam revealed minimal tenderness, no swelling, no redness, no pain with gentle flexion or extension movements, negative straight leg raise tests, normal motor reflexes, and decreased sensation in his left great toe. (Tr. 269). His x-rays showed intact instrumentation, but his "L1 [was] still considerably anterior to S1." (Tr. 269). It was noted that "[b]ack pain [was] not an issue . . ." (Tr. 269). Dr. Gillick suggested that Plaintiff try Neurontin and Tramadol for pain. (Tr. 269). He scheduled a follow-up appointment for one (1) year later. (Tr. 269).

On June 7, 2011, Plaintiff had an appointment with Sumaira Khan, M.D., a consultative examiner with the BDD. (Tr. 271). Dr. Khan reviewed Dr. Gillick's medical reports, and performed a physical exam. (Tr. 271-273). A musculoskeletal examination revealed that Plaintiff had reduced left hip flexion, decreased left hip internal rotation, reduced left back extension and abduction, and unremarkable cervical and lumbar exams. (Tr. 273). Dr. Khan's assessment was that Plaintiff had chronic low back pain and status post spinal fusion surgery. (Tr.

273). Dr. Khan opined that, in an eight (8) hour workday, Plaintiff could: (1) frequently lift ten (10) pounds and carry twenty (20) pounds; (2) stand for one (1) hour or less a day; (3) sit for forty-five (45) minutes to one (1) hour; (4) engage in unlimited pushing and pulling within the lifting and carrying weight restrictions; (5) frequently balance; and (6) occasionally bend, kneel, stoop, crouch, and climb. (Tr. 277-278). Plaintiff had no environmental limitations and no limitations with reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting, smelling, or continence. (Tr. 278). On July 1, 2011, Dr. Khan further opined that Plaintiff had a normal gait and could walk without an artificial device. (Tr. 280).

On July 13, 2011, Plaintiff underwent a physical RFC assessment performed by Elizabeth Kamenar, M.D. (Tr. 84-86). Dr. Kamenar opined that, in an eight (8) hour workday, Plaintiff could: (1) occasionally lift and/ or carry twenty (20) pounds; (2) frequently lift and/ or carry ten (10) pounds; (3) stand and/ or walk for about six (6) hours; (4) sit for about six (6) hours; (5) engage in unlimited pushing and/ or pulling within the aforementioned weight limitations; (6) occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and (7) never climb ladders, ropes, or scaffolds. (Tr. 85). He did not have any manipulative, communicative, or visual limitations. (Tr. 85-86). He did have environmental limitations, and Dr. Kamenar opined Plaintiff should avoid concentrated exposure

to extreme cold, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 86).

On July 22, 2011, Plaintiff's mental health medical records were reviewed by consultative examiner Anthony Galdieri, Ph.D., who also performed an examination of Plaintiff. (Tr. 82-83). With regards to Listing 12.04, Affective Disorders, based on a review of the medical records, Dr. Galdieri concluded that Plaintiff had: (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence or pace; and (4) no repeated episodes of decompensation. (Tr. 83). Dr. Galdieri also opined that evidence did not establish the presence of "C" criteria for Listing 12.04. (Tr. 83). As an explanation to support this opinion, Dr. Galdieri stated that Plaintiff drove himself to the office, had intact memory, a depressed affect, adequate insight and judgment, and was oriented in all three (3) spheres. (Tr. 83). In the Mental RFC Assessment, Dr. Galdieri opined that Plaintiff: (1) was not significantly limited in his ability to remember locations and work-like procedures, in his ability to understand and remember very short and simple instructions, in his ability to carry out very short and simple instructions, in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, in his

ability to sustain an ordinary routine without special intervention, in his ability to work in coordination with or in proximity to others without being distracted by them, in his ability to make simple work-related decisions, in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, in his ability to interact appropriately with the general public, in his ability to ask simple questions or request assistance, in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, in his ability to be aware of normal hazards and take appropriate precautions, in his ability to travel in unfamiliar places or use public transportation, or in his ability to set realistic goals or make plans independently of others; and (2) was moderately limited in his ability to understand and remember detailed instructions, in his ability to maintain attention and concentration for extended periods, in his ability to carry out detailed instructions, in his ability to accept instructions and respond appropriately to criticism from supervisors, and in his ability to respond appropriately to changes in the work setting.  (Tr. 86-88).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2013. (Tr. 12). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of December 1, 2008. (Tr. 12).

At step two, the ALJ determined that Plaintiff suffered from the severe[6]

---

6. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's

combination of impairments of the following: "degenerative disc disease of the lumbar spine with disc herniation at L4-5, status post discectomy, fusion, laminectomy, and decompression, major affective disorder (20 C.F.R. 404.1520(c))." (Tr. 12).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 14).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 15). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except that [Plaintiff] requires a sit/stand option transferring positions from sitting every hour with standing for only 15 minutes at a time but [Plaintiff] would not be off task while transferring. [Plaintiff] could occasionally stoop, balance, crouch, crawl, kneels and climb but never on ladders, ropes or scaffolds. [Plaintiff] could occasionally push/ pull with the lower extremities. He must avoid concentrated exposure to temperature extremes of cold, humidity, wetness, vibrations and hazards. [Plaintiff] is limited to occupations that do not involve complex or detailed tasks, but he could perform simple tasks in a low stress environment, which is defined as only occasional changes in the work place

---

ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

and occasional decision making.

(Tr. 15).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." (Tr. 19-20).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between December 1, 2008, the alleged onset date, and the date of the ALJ's decision. (Tr. 20-21).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ improperly substituted her own opinion for that of a medical opinion and erred in the weight she afforded to the medical opinions provided in determining Plaintiff's RFC ; (2) Plaintiff met the criteria for Listing 1.04, Disorders of the Spine, and Listing 12.04, Affective Disorders ; and (3) the ALJ erred in determining Plaintiff's credibility. (Doc. 13, pp. 5-13). Defendant disputes these contentions. (Doc. 18, pp. 13-37 ).

1.   **Medical Opinion Evidence**

Plaintiff asserts that the ALJ erred in the weight she afforded to the treating and examining source opinions. (Doc. 8, pp. 12-14). Plaintiff argues that the ALJ relied on her own expertise in arriving at the RFC rather than a medical opinion for Plaintiff's mental and physical impairments, and committed error of law by failing to afford proper weight to Dr. Gillick's opinion with adequate explanation of her rejection of this treating physician's opinion in favor of the opinion of one-time examiner Dr. Bosacco. (Doc. 13, pp. 9-11).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Additionally, the Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.).

Regarding the medical opinion evidence in relation to Plaintiff's mental health impairments, the ALJ assigned partial weight to the opinion of Dr. Ciaravino that Plaintiff had "some moderate limitations but the undersigned does not find her opinions with regard to marked limitations to be supported by the overall objective medical evidence of record, including Dr. Ciaravino's own opinion of a GAF 55 which falls within the moderate realm." (Tr. 18). The ALJ also found the opinion of the psychological consultant, Dr. Galdieri, to be "persuasive." (Tr. 19).

However, the ALJ did not assign weight one way or another to Dr. Galdieri's opinion. Instead, it appears as though the ALJ has failed to explain

what medical opinion she relied on in determining Plaintiff's mental RFC because she did not give any significant or great weight to any medical opinion regarding Plaintiff's mental health. Instead, the ALJ seemingly interpreted the medical evidence of record, and substituted her own opinion for that of a medical one in arriving at Plaintiff's mental RFC by cherry-picking limitations from the opinions of Dr. Ciaravino and Dr. Galdieri, while omitting limitations as described in these opinions without providing an explanation as to the omissions and without giving significant weight to any mental health medical opinion.[7] Therefore, because the ALJ has apparently relied on her own substituted medical opinion in arriving at Plaintiff's mental RFC, substantial evidence does not support the ALJ's RFC finding. As such, the remaining issues raised in Plaintiff's complaint will not be addressed as remand is warranted.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

---

7. Ultimately, the ALJ concluded that "[Plaintiff] is limited to occupations that do not involve complex or detailed tasks, but he could perform simple tasks in a low stress environment, which is defined as only occasional changes in the work place and occasional decision making." (Tr. 15).

of the Commissioner will be vacated, and the matter will be remanded to the

Commissioner for further proceedings.

A separate Order will be issued.

**Date**: October 6, 2015

                                        **/s/ William J. Nealon**
                                        **United States District Judge**